Case 4:23-cr-00449   Document 44   Filed on 06/02/25 in TXSD   Page 1 of 14

United States District Court
Southern District of Texas
**ENTERED**
June 02, 2025
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** § | |
| § | |
| **VS.** § | **H 23-CR-0449** |
| § | |
| **HOMERO CABRERA-MORA,** § | |
|  a.k.a. David Zamora Morales, § | |
| § | |
| **Defendant.** § | |

## MEMORANDUM AND ORDER

Before the Court is the Government's Motion for Reconsideration (Doc. 41), seeking to vacate this Court's March 10, 2025 Order dismissing the indictment against Defendant Homero Cabrera-Mora without prejudice. The Government contends that the Court erred in applying the Speedy Trial Act, 18 U.S.C. § 3161(b), particularly regarding the commencement of the speedy trial clock and the applicability of the "ruse exception." *United States v. De La Pena-Juarez*, 214 F.3d 594, 598 (5th Cir. 2000). For the reasons below, the motion is **DENIED**.

I.  **BACKGROUND**

On March 30, 2023, a coordinated narcotics investigation led by the FBI's Houston Coastal Safe Streets Task Force (HCSSTF) culminated in the arrest of Homero Cabrera-Mora (a.k.a. David Zamora Morales) ("Morales" or "Mr. Morales") following a planned "buy/walk" operation. Doc. 24 at 2. The operation originated weeks earlier when a confidential informant (CS-1) provided FBI agents with intelligence about a Mexican narcotics broker who facilitated connections to Houston-based distributors. Doc. 24 at 2; Doc. 25 at 1. Acting on this information, FBI Special Agent Rafael Vences and Task Force Officer Jose Santos (overseen by FBI Agent Derrick Jarardi) directed a

second confidential source (CS-2) to arrange the purchase of one kilogram of methamphetamine from Cabrara-Mora, setting the transaction at a Pluckers restaurant parking lot in Webster, Texas. Id. Surveillance teams observed Morales arrive in a black Toyota Tacoma, deliver the drugs, and depart—prompting FBI SA Vences and TFO Santos to instruct CS-2 to request an additional 60 kilograms, which Morales confirmed he could supply. Doc. 24, Exh. 1 at 6.

Morales, en route to the second transaction, was stopped by Houston Police Department (HPD) Officer Jorge Elizondo for a traffic violation—failing to signal a turn. Doc. 24, Exh. 2 at 1. At the scene, a federal agent approached and instructed Officer Elizondo to arrest Mr. Morales on state charges, with federal charges to be filed later. Doc. 24 at 4, *citing* Exhibit 3 [bodycam footage at 22:40]. Body camera footage reveals that the state police officers remarked that this was a federally driven case, and that the state officers would not be needed beyond the traffic stop. " Doc. 24 at 4, *citing* Exh. 3 [bodycam footage at 28:15]. A narcotics K-9 alerted to Morales' vehicle, leading to the discovery of 40 kilograms of crystal methamphetamine in black trash bags and a cooler in the truck bed, along with a Glock 17 pistol on Morales' person. Doc. 41 at. 5; Doc. 24, Exh. 1 at 6. Meanwhile, Morales was being interrogated by federal agents. Doc 24 at 4. FBI SA Vences took immediate custody of all evidence (including the cooler and pistol), transporting it to the FBI's Houston field office for processing—bypassing HPD's narcotics lab, which lacked the capability to test drug purity. Doc. 24, Exh. 1 at 6, Doc. 41 at 9.

Morales was booked into state custody on Texas felony charges (Possession of a Controlled Substance with Intent to Deliver, Crystal Methamphetamine), but the Harris County District Attorney's Office never secured an indictment during his time in state custody. Doc. 24, Exh. 1 at 6, Doc. 24 at 1. Over the next five months, Morales remained in state custody. During

that time, the court appointed two defense attorneys, ordered discovery disclosures, and issued its scheduling procedures. Doc. 25 at 3. The state case did not otherwise substantively develop. Meanwhile, federal prosecutors claim they had no contact with Morales' case until August 2023, when AUSA Stuart Burns—after a conversation with the arresting FBI agent—elected to pursue federal charges Doc. 25 at 2–3). The federal criminal complaint was filed on August 23, 2023, and Morales was transferred to federal custody on August 30, the same day Harris County dismissed its charges. Doc. 24 at 4.

On September 30th, 2024, Defendant filed a Motion to Dismiss for Speedy Trial Violation, arguing that Morales' state detention was a "ruse" to evade federal indictment deadlines. Doc. 24. The Court heard oral argument on the case on March 10th, 2025, and granted the Motion to Dismiss without prejudice. *See* Minute Entry dated 3/10/2025. On March 31st, the Government filed the instant Motion for Reconsideration. Doc. 41.

## II. STANDARD OF REVIEW

Motions for reconsideration in criminal cases, while not expressly authorized by the Federal Rules of Criminal Procedure, are evaluated under standards analogous to Federal Rule of Civil Procedure 59(e). *United States v. Rollins,* 607 F.3d 500, 502 (7th Cir. 2010). Relief under Rule 59(e) is an "extraordinary remedy that should be used sparingly." *Templet v. HydroChem Inc.*, 367 F.3d 473, 479 (5th Cir. 2004). The Fifth Circuit has established that reconsideration may be granted only where the movant demonstrates: (1) an intervening change in controlling law; (2) the availability of newly discovered evidence that could not have been discovered earlier through the exercise of due diligence; or (3) the need to correct a clear error of law or fact to prevent manifest injustice. Fed. R. Civ. P. 59(e); *Schiller v. Physicians Res. Grp.*, 342 F.3d 563, 567-568 (5th Cir. 2003).

Notably, Rule 59(e) motions cannot be used to relitigate issues already decided or to advance arguments that could have been raised earlier. *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990) (quoting *Federal Deposit Ins. Corp. v. Meyer*, 781 F.2d 1260, 1268 (7th Cir.1986)). The party seeking reconsideration bears a "high burden" to show that extraordinary circumstances justify revisiting the Court's prior decision. *United States v. Salinas*, 665 F.Supp.2d 717, 720 (W.D. Tex. 2009).

### III. ANALYSIS

The Speedy Trial Act requires that an indictment be filed within thirty days of arrest. 18 U.S.C. § 3161(b). The Fifth Circuit has emphasized that the Act is "designed to protect a criminal defendant's constitutional right to a speedy trial, and also to serve the public's interest in prompt criminal proceedings." *United States v. Gonzalez-Rodriguez,* 621 F.3d 354, 368 (5th Cir. 2010). "An individual is 'arrested' under the Speedy Trial Act only when he is 'taken into custody after a federal arrest for the purpose of responding to a federal charge.'" *United States v. De La Pena-Juarez,* 214 F.3d 594, 597 n.6 (5th Cir. 2000) (quoting *United States v. Johnson,* 815 F.2d 309, 312 (5th Cir.1987)). Failure to comply with the Act's 30-day time limit results in dismissal. 18 U.S.C. § 3162(a)(1); *De La Pena-Juarez,* 214 F.3d at 597.

As a general rule, state arrests on state charges do not activate the Speedy Trial Act's requirements. *United States v. Green*, 508 F.3d 195, 201-02 (5th Cir. 2007). Similarly, the Act does not apply to "civil detention generally" or "ICE administrative detention specifically." *United States v. Rodriguez-Amaya*, 521 F.3d 437, 441 (4th Cir. 2008). This principle is well-established in the Fifth Circuit, *see De La Pena-Juarez*, 214 F.3d at 597-98, and has been adopted by a majority of circuits, *see United States v. Pasillas-Castanon*, 525 F.3d 994, 997 (10th Cir. 2008) (collecting cases from the First, Third, Fifth, Sixth, Eighth, Ninth, and Eleventh Circuits).

However, both this circuit and others recognize the "ruse exception" to this general rule. *Pasillas-Castanon*, 525 F.3d at 997 (citing decisions from multiple circuits). As articulated in *De La Pena-Juarez*, this exception provides that "an INS arrest triggers the Speedy Trial Act's time clock where the administrative and criminal charges against the defendant are identical such that the detention is simply used as a substitute for criminal arrest." 214 F.3d at 598 (internal quotation marks omitted). Such detention occurs when civil authorities act "primarily or exclusively to develop criminal charges involving the conduct on which the civil arrest was based." *Id.* (quoting *United States v. Restrepo*, 59 F. Supp. 2d 133, 137 (D. Mass. 1999)). Courts apply the ruse exception to protect defendants "against the possibility of collusion between federal criminal authorities and civil or state officials." *De La Pena-Juarez*, 214 F.3d at 598.

Certain limitations govern this exception. "[T]he mere fact that the detaining authorities are aware other potential criminal charges are available does not trigger the exception." *Pasillas-Castanon*, 525 F.3d at 998. Rather, the defendant bears the burden to "demonstrate[] that the primary or exclusive purpose of the civil detention was to hold him for future criminal prosecution." *De La Pena-Juarez*, 214 F.3d at 598.

On March 10, 2025, the Court found that the ruse exception applied to the instant case. Soon after, the Government filed the instant Motion for Reconsideration. arguing that (1) there was clear error in applying the ruse exception and (2) that there is newly discovered evidence and case law that warrants reconsideration. Doc. 41. The Court will address each contention in turn.

### A.  There Was No Clear Error in Applying the Ruse Exception

The Government contends the Court misapplied the ruse exception, which treats a state detention as a federal arrest under the Speedy Trial Act if the state proceeding was a "mere ruse" to hold the defendant for federal prosecution. Doc. 41 at 8. *United States v. De La Pena-Juarez*,

214 F.3d 594, 598 (5th Cir. 2000). The exception requires proof that the primary or exclusive purpose of the detention was to facilitate federal charges. *Id.* Their argument does not withstand scrutiny.

The record leaves no doubt that federal authorities orchestrated Morales' arrest and detention as part of a federal prosecution strategy. The FBI's Houston Coastal Safe Streets Task Force (HCSSTF) developed the confidential informants who facilitated the drug transaction, "direct[ed]" HPD to conduct the traffic stop, and immediately seized evidence—including 40 kilograms of methamphetamine—for federal analysis. Doc. 41 at 4. Body camera footage confirms federal agents interrogated Morales at the scene (while state officers remarked the case would was federal, and did not need state involvement) Doc. 24, Ex. 2 at 28:20. Critically, the state held Morales for five months without indictment, dismissing charges just seven days after federal prosecution began—a sequence that courts have indicated is strong evidence of a placeholder prosecution. *United States v. Quinones*, 2013 WL 4482909, at *12-16 (S.D. Tex. 2013) (Rosenthal, J.).

The Government brings two primary arguments in an attempt to dispute this as evidence of collusion. First, the Government claims federal custody of narcotics was routine for drug purity testing and should not have been taken as evidence of collusion. Doc. 41 at 8-9. Second, the Government stresses the communication between state and federal officials throughout the investigation and state prosecution of Morales was routine and minimal. *Id*. at 9-10 Neither argument withstands scrutiny.

The Government's claim that federal custody of narcotics was merely for routine drug testing ignores that the FBI retained all physical evidence from the outset, including the firearm which had no bearing on purity analysis. Doc. 24, Exh. 1 at 6. The weapon's transfer to FBI custody

bellies the Government's contention that this was a state matter requiring limited forensic support for methamphetamine testing—instead, this is much more indicative of the federal government taking custody of all evidence for its own investigative purposes, regardless of if it had any bearing on the state's necessity for purity testing. Moreover, while the Government argues that the routine procedure in cases that require qualitative analysis of bulk methamphetamine is typically done by HPD first "report[ing] that a substance contains methamphetamine" and then "an outside lab conduct[s] the testing…[t]ypically, this falls to a federal counterpart (usually DEA)," the Government glides over the fact that is not what happened here. Doc. 41 at 8. Federal agents took custody of *all* evidence immediately at the arrest scene, before any determination could have been made about testing needs or state lab capabilities. Doc. 24, Exh. 1 at 5.

While federal labs may routinely conduct advanced analyses (e.g., methamphetamine purity testing) for state cases through formal evidence-sharing protocols, the Government fails to explain three critical deviations from standard practice here: (1) why federal agents collected the firearm—which required no specialized testing—alongside the drugs; (2) why they waited five months to seek indictment despite having all evidence in federal custody since arrest; and (3) why the record lacks any documentation of state authorities submitting evidence or requesting test results. Instead, the record shows *only* federal agents handling and processing the evidence from arrest through indictment—and the Government fails to provide any evidence to the contrary.[1]

---

[1] In its Motion for Reconsideration, the Government references information from a March 28, 2025, phone call between AUSA Shelley J. Sullivan and Officer Jaradi. Doc. 41 at 2n1 ("Officer Jaradi confirmed that he sent a photograph of the bulk methamphetamine to AUSA Burns on March 30/31, 2023, but did not ask for federal charges to be brought"). The Government's proffered evidence fails to meet Rule 59(e)'s standard. The Government does not explain why the March 28, 2025, phone call could not have occurred prior to the Court's original judgment, and they do not justify why the Court should consider this evidence now. *Simon,* 891 F.2d at 1159.

This is not a case of temporary federal assistance, but of federal appropriation of the prosecution from beginning to end.

Second, the Government's characterization of interagency communication as "routine" ignores the federal agents' on-scene statements about impending federal prosecution and the federal government's early direction of this case prior to the prosecutors' later involvement. Doc. 41 at 10. The Government argues that "discussions" and "routine cooperation" between state and federal officials "is not prohibited and does not evidence collusion." *Id*. This Court agrees. However, the evidence at issue here was not mere "discussions" nor were they "routine" for what was supposedly a state prosecution. The record shows federal agents didn't merely communicate with state officers - they directed them at every juncture, from orchestrating the controlled buy through supervising the traffic stop and immediately assuming custody all physical evidence while directing where the custody of the defendant will be.

Furthermore, the Government's emphasis on AUSA Burns' purported lack of involvement until August 2023 is similarly unavailing. The Government points out that "only a federal prosecutor can accept charges for federal prosecution," seemingly arguing that direction between federal and state officials does not amount to collusion evidence unless a prosecutor is involved in the state's action (or inaction) in their respective case. Doc. 41 at 9. This is not the law. Indeed, under Fifth Circuit jurisprudence, the relevant inquiry has focused on the actions and intentions of law enforcement officers who effectuated the arrest and initiated detention, not just prosecutors. *United States v. Johnson*, No. 3:18-CR-217-DPJ-FKB, 2021 WL 3179308 at *7 (S.D. Miss. July 26, 2021) (evaluating whether *officer-level collusion* during arrest, not prosecutorial intent, could trigger the ruse exception, and finding the argument "not frivolous" where local police indicated that a defendant's detention was solely dependent on the conclusion of a federal investigation). In

fact, there is no law or case requiring that an AUSA's involvement must overwhelmingly contribute to collusion in order for the ruse exception to apply. The FBI agents on scene made clear their intention to pursue federal prosecution through both their statements to HPD officers and their immediate seizure of evidence for federal processing—HPD, on the other hand, did not meaningfully involve itself in the defendant's arrest nor did they take any meaningful steps to indict him in the five months that he was in their custody. Doc. 24 at 6.  The Speedy Trial Act clock starts when federal agents functionally control an arrest, regardless of when prosecutors formally file charges. *De La Pena-Juarez*, 214 F.3d at 598 (citing *United States v. Restrepo*, 59 F. Supp. 2d 133 (D. Mass. 1999)) ("[w]hile a [civil or state detention] alone does not necessarily trigger the Speedy Trial Act, where that period of detention is used primarily or exclusively to develop criminal charges involving the conduct on which the [civil or state] arrest was based, the time limit established by the Speedy Trial Act begins running on the date of the [civil or state] arrest"). Here, the FBI's direction of the informants, arrest, and evidence custody established federal control from the outset—especially in light of the state's inaction in its respective case and immediate dismissal of the charges once the defendant was in federal custody.[2]

---

[2]    In a final effort to justify reconsideration, the Government advances three flawed arguments: (1) the case's simplicity precludes applying the ruse exception; (2) its conduct does not warrant the exception's deterrent purpose; and (3) any Speedy Trial Act violation is cured by potential sentencing credit. Doc. 41 at 10-11. None withstand scrutiny.
   First, the Government wrongly suggests that a "simple" case cannot trigger the ruse exception. The Fifth Circuit's test turns on federal control over detention—not case complexity. *De La Pena-Juarez*, 214 F.3d at 598. If anything, the straightforward nature of this prosecution makes the five-month delay *more* suspect, as there was no legitimate reason to defer indictment on either the state or federal level.
   Second, the Government's conduct epitomizes the very abuse the ruse exception was designed to prevent. Federal agents orchestrated the arrest, seized all evidence, and signaled their intent to prosecute—all while using state custody to evade the Speedy Trial Act's 30-day deadline. This is precisely the scenario *United States v. Cepeda-Luna,* 989 F.2d 353, 355 (9th Cir. 1993), condemned as an impermissible end-run around federal protections.

## B. There Is No Intervening Change of Controlling Law, Nor Is There Newly Discovered Evidence

The Government next seeks reconsideration of the Court's dismissal on account of *United States v. Pendergrass*, 2025 WL 78172 (11th Cir. 2025), an Eleventh Circuit decision, using it as potential evidence of an intervening legal development. Doc. 42. However, this decision is neither binding on this Court nor factually analogous to the present case. In *Pendergrass*, the defendant was arrested by Atlanta police in 2013 for fraudulently attempting to claim unclaimed government funds. *Pendergrass*, 2025 WL 78172, at *3–4. While federal postal inspectors assisted with evidence collection, the investigation remained state-led, and Pendergrass was initially held on state charges. *Id.* at *4 ("postal inspectors were involved [with the arrest only] because the United States Postal Inspection Service was investigating Pendergrass for another fraudulent scheme"). Federal prosecutors did not indict him until 2017—four years later—for unrelated fraud charges. *Id*. The Eleventh Circuit rejected his Speedy Trial Act claim, holding that the federal involvement in his state arrest (e.g., task force cooperation or evidence sharing) did not amount to collusion. *Id.* at *20.

The Government's reliance on *Pendergrass* in the instant case is misplaced. In *Pendergrass*, the Eleventh Circuit emphasized the defendant's arrest was initiated, directed, and led by Atlanta police officers with federal involvement limited to postal inspectors assisting evidence collection for what remained a state-led prosecution of an unrelated scheme. *Id.* at *3.

---

Third, the claim that sentencing credit remedies the violation misconstrues the Act's purpose. The 30-day indictment deadline is absolute, and its breach cannot be excused retroactively. Prolonged detention inherently prejudices defendants by restricting access to counsel and impeding defense preparation—harms that persist regardless of later credit. Moreover, the ruse exception targets the *misuse of state processes* to bypass federal requirements, rendering sentencing credit irrelevant to the analysis.

This stands in stark contrast to the present facts, where the FBI actively directed investigation of the defendant, gave orders to the confidential informant, commanded the traffic stop, assumed custody of evidence, and blankly stated that the case was a "federal" one - conduct demonstrating federal control from inception. *See supra* Section III (A). This factual disparity regarding the levels of federal involvement and direction of state officials reveals why *Pendergrass*—where federal involvement was secondary—provides no safe harbor here.

Moreover, *Pendergrass* is non-binding and conflicts with Fifth Circuit precedent. First, it's important to note that the Eleventh Circuit rested its decision to not apply the ruse exception in *Pendergrass* on the circuit's limited recognition of the exception's application only to "federal immigration detention cases," noting it had "not previously applied [the exception] in this context" of state-federal criminal investigations. *Pendergrass*, 2025 WL 78172, at *6. This narrow construction contrasts sharply with the Fifth Circuit's broader and binding application of the exception in *De La Pena-Juarez*, where the court emphasized its role in protecting against "collusion between federal criminal authorities and civil *or state* officials" across contexts. 214 F.3d at 598 (emphasis added). Moreover, while the *Pendergrass* court dismissed the defendant's ruse exception argument by citing cases from other circuits where similar facts "have not triggered the exception," it conspicuously relied on cases that addressed only isolated aspects of his claims. *Pendergrass*, 2025 WL 78172 at *19.[3] The *Pendergrass* decision parsed the individual factors of

---

[3] The Eleventh Circuit points to four factors that cumulate into the defendant's ruse exception argument, including (1) "federal agents were involved in the case at the time of. . .arrest," (2) "evidence was turned over to federal authorities," (3)"state investigators acknowledged that the case was going to be indicted by federal authorities," and (4)"no state case charges were ever lodged." *Pendergrass*, 2025 WL 78172 at *19 (internal quotations omitted). The court then cited to four separate cases that seemed to find that each of these factors individually did not meet the ruse exception. *See, e.g., United States v. Iaquinta*, 674 F.2d 260, 268 (4th Cir. 1982) (holding that the actions of federal officers present and assisting with arrest and obtaining search warrants were insufficient to trigger the Speedy Trial Act's time

the defendant's detention, choosing to highlight how each of his claims *alone* have failed to meet the ruse exception in other circuits, and did not address how the defendant's claims—taken holistically—meet or do not meet the ruse exception's standards. *Id*. This Court finds that the Eleventh Circuit's *Pendergrass* decision is not binding on the Fifth Circuit and also declines to find it persuasive, particularly in light of the Fifth Circuit's own precedent, which urges a holistic view of a defendant's circumstances when analyzing an application of the ruse exception. *De La Pena-Juarez*, 214 F.3d at 598-599 (reviewing defendant's claims of collusion holistically, and applying the ruse exception only "where the defendant demonstrates that the primary or exclusive purpose of the civil detention was to hold him for future criminal prosecution").

A much more analogous case to look to for our purposes is *United States v. Quinones*, No. H-13-391-1, 2013 WL 4482909 (S.D. Tex. Aug. 19, 2013). In *Quinones*, CBP officers detained

---

limit); *United States v. Johnson*, 65 F.4th 932, 938 (7th Cir. 2023) ("[S]tate and federal prosecutors consult and cooperate with one another all the time. Routine consultations and decisions by one to defer to the other . . . fall far short of what might be needed to invoke the possible exception."); *United States v. Mearis*, 36 F.4th 649, 654 (5th Cir. 2022) (holding that emails between federal and state prosecutors regarding their respective charges were not evidence of collusion); *United States v. Clark*, 754 F.3d 401, 405 (7th Cir. 2014) ("If an agency relationship were present this might be a closer point . . . .").
    Critically, none of these cases addressed whether all four factors together would be enough to meet the ruse exception. Moreover, the cited cases in *Pendergrass* support a finding that the ruse exception applies to the instant case. *Johnson*, 65 F.4th at 938 ("There might be a federal speedy trial violation if the state. . .[charged the defendant] solely in order to detain him pending an eventual federal indictment"); *Mearis*, 36 F.4th at 654 (holding that emails between federal and state prosecutors regarding their respective charges were not evidence of collusion when there was clear evidence that "the state planned to go forward with their independent prosecution" if the federal authorities chose not to do so); *Clark*, 754 F.3d at 405 (7th Cir. 2014) (finding no speedy trial violation where "the record is devoid of any indication that the federal government was involved at all in his prosecution at the time of [the arrest], let alone that it instructed the state authorities to arrest [defendant]"). Here, as explained previously, the defendant has presented evidence that the state charged defendant solely to detain him without intent to prosecute him if the federal case did not move forward, that the federal government was involved with the prosecution and investigation of defendant prior to arrest, and that the federal government was the one to instruct the state authorities to arrest defendant.

the defendant on May 19, 2013, and immediately presented the case to prosecutors, who accepted it that same day—yet delayed indictment for 37 days to gather evidence. *Id*. at *11. The court condemned this as a "delay used to gather evidence for the criminal charges that the U.S. Attorney's Office had decided to bring more than 30 days before the indictment issued" *Id.* at *12. Here, the FBI orchestrated Morales' arrest (directing the informant and traffic stop), seized evidence, and interrogated him at the scene while state officers stood by—all hallmarks of federal control. *See supra* Section III(A). Yet prosecutors waited five months to indict—paralleling facts the *Quinones* court found was indicative of a strategy to prolong detainment. *Quinones, 2013 WL 4482909* at *12 ("[t]he record, however, does not support the argument that the primary reason for detaining [the defendant]" was to resolve the non-federal case). Where, as here, federal agents orchestrate the investigation, direct the arrest, and immediately begin building a federal case, the arrest is properly considered federal for Speedy Trial Act purposes. The Government has not demonstrated any existing or intervening changes in the law that compel reconsideration.

Nor has the Government shown manifest injustice. Dismissal without prejudice preserves the possibility of re-prosecution, and the Court's ruling aligns with the Fifth Circuit's mandate to prevent "collusion between federal authorities and civil or state officials." *De La Pena-Juarez*, 214 F.3d at 598.

## IV. CONCLUSION

The Government's Motion for Reconsideration is **DENIED**. The Court's March 10, 2025, Order dismissing the indictment without prejudice stands.

**IT IS SO ORDERED**.

Signed at Houston, Texas on June 2nd, 2025

                                               Keith P. Ellison
                                               United States District Judge